# In the District Court of the United States
## For The District of South Carolina
### BEAUFORT DIVISION

| | |
|---|---|
| Michael A. Lee, #19864-056, ) | Civil Action No.  9:06-1947-MBS-GCK |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| Lorenzo Guavara, Assistant Health ) | **OF THE MAGISTRATE JUDGE** |
| Services Administrator, ) | |
| P.A. Hamme, Physicians Assistant, ) | |
| P.A. Faytong, Physicians Assistant, ) | |
| Amy Williams, X-Ray Technician, ) | |
| United States of America, ) | |
| ) | |
| Defendants. ) | |

## I.  INTRODUCTION

The Plaintiff, Michael A. Lee ("Plaintiff" or "Lee"), is a federal prisoner who was incarcerated in the Federal Correctional Institution in Edgefield, South Carolina ("FCI Edgefield") at the time of the alleged events giving rise to this action.  Proceeding *pro se*, he filed this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging violations of his First, Fifth, Eighth, and Fourteenth Amendment rights.  He also sets forth claims under the Federal Tort Claims Act, 28 U.S.C. § 2571-2680 (2000) ("FTCA") for alleged medical malpractice and infliction of emotional stress.  He seeks monetary damages from the above-captioned defendants, Lorenzo Guavara, Assistant Health Services Administrator ("Guavara"), P.A. Hamme, Physicians Assistant ("Hamme"), P.A. Faytong, Physicians Assistant ("Faytong"), Amy Williams, X-Ray Technician ("Williams"), and the United States of America ("United States") for physical and emotional injuries suffered as a result of the allegedly negligent medical care he received while incarcerated in FCI-Edgefield.

The Plaintiff alleges that the individual defendants were employed by the Bureau of Prisons (the "BOP") and worked at FCI-Edgefield at the time of the incidents giving rise to the Plaintiff's complaint.  Plaintiff filed this action against the defendants in their individual and official capacities.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(e), D.S.C., the undersigned United States Magistrate Judge is authorized to review all pretrial matters in cases involving *pro se* litigants, and submit findings and recommendations to the District Court.

## II. *PRO SE* COMPLAINT

Plaintiff is a *pro se* litigant, and thus his pleadings are accorded liberal construction.  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Haines v. Keener*, 404 U.S. 519 (1972); *Loe v. Armistead*, 582 F. 2d 1291 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied, Leeke v. Gordon*, 439 U.S. 970 (1978).  Under established local procedure in this judicial district, a careful review has been made of the *pro se* complaint herein pursuant to the procedural provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, Title I, § 104, 110 Stat. 1214.  This review has been conducted in light of the following precedents:  *Denton v. Hernandez*, 504 U.S. 25 (1992); *Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989); *Haines v. Keener*, 404 U.S. 519 (1972); *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951 (4th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 1177 (1996); *Todd v. Baskerville*, 712 F.2d 70 (4th Cir. 1983).

*Pro se* pleadings are held to a less stringent standard than those drafted by attorneys.  *Hughes*, 449 U.S. 5 (1980).  Even under this less stringent standard, however, the *pro se* complaint nonetheless may be subject to summary dismissal.  The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably

read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to include claims that were never presented. *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999). Likewise, a court may not construct the plaintiff's legal arguments for him (*Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993)) or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986). The requirement of liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *Rice v. National Security Council*, 244 F.Supp 2d 594 (D.S.C. 2001), *citing Weller v. Dep't of Social Services*, 901 F.2d 387 (4th Cir. 1990).

### III.  PROCEDURAL HISTORY

Plaintiff filed this action on June 27, 2006.[1]  [1]  After the case was brought into proper form, an Order authorizing service of process by the clerk was issued on August 30, 2006.  [9]  On November 27, an answer was filed on behalf of the Defendants [13], and on December 7, 2006, an amended answer was filed.[2]  [15]  The Defendants Guavara and Williams admitted that the Plaintiff had exhausted his administrative remedies prior to filing suit.  The Defendants further asserted that Faytong was immune from suit pursuant to 42 U.S.C. 233(a) (1998), that the Plaintiff's recovery for his FTCA claim was limited to the amount of $1 Million, as set forth in his administrative tort claim; that the Defendants

---

[1]  The Plaintiff has the benefit of the holding of *Houston v. Lack*, 487 U.S. 266, 101 L.Ed.2d 245, 108 S.Ct. 2379 (1988), with respect to the "delivery" date of his Complaint.  *See* Order [4] at p. 1.

[2]  In their Amended Answer, the Defendants noted that Hamme and Faytong had not yet been served in the case.  Subsequently, the Motion for Summary Judgment was filed on behalf of all Defendants, with declarations from each Defendant attached thereto.  Therefore, the court finds that the Defendants have waived any defense as to lack of service with respect to Hamme or Faytong.

were entitled to qualified immunity; and that the Plaintiff was contributorily negligent by failing to follow his doctor's instructions.

On January 16, 2007, counsel for the Defendants filed a Motion for Summary Judgment.[3]  [22]  On January 18, the undersigned issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the Motion to Dismiss within thirty-four (34) days.  [25]  The Plaintiff filed his Response [35] and the case is now ripe for disposition by the undersigned United States Magistrate Judge.

## IV.  BACKGROUND AND EVIDENCE

The facts and evidence are considered and discussed in the light most favorable to the Plaintiff, the party opposing summary judgment.  *Pittman v. Nelms*, 87 F.3d 116, 118 (4th Cir. 1996).  Plaintiff alleges that on Saturday, October 9, 2004, he was injured while playing football at FCI-Edgefield.  The Plaintiff went to medical services and told Faytong, who was on duty, that he thought he had broken his right foot.  Faytong, whom the Plaintiff alleges was not a certified or trained X-ray technician, took an X-ray of the Plaintiff's foot, reviewed it, and told the Plaintiff that he had sprained his ankle.  (*See* Complaint [1] at p. 3).  The Plaintiff complained of pain and asked Faytong to call the Lieutenant on duty.  Hamme entered the room, reviewed the X-ray and stated it looked suspicious but could not confirm whether the Plaintiff's foot was fractured.  The Plaintiff alleges that Hamme was not a certified or trained X-ray technician.  The Plaintiff asked to be taken to a hospital.  (*See* Complaint [1] at p. 5).  Plaintiff recalls that Faytong and Hamme placed an open splint on the Plaintiff's right foot, gave the Plaintiff aspirin and a

---

[3]     Counsel for the Defendants stated that the Motion was made "pursuant to Fed.R.Civ. P. 12(b)(6) and 56" and the Memorandum set forth the standard of review applicable to Rule 12(b)(6) motions.

pair of crutches, and sent him back to his dorm.  (*See* Complaint [1] at pp. 5-6).  The

Plaintiff also was told not to bear weight on his right foot, and was given a bottom bunk

pass.  (Hamme Dec. [22-6] at ¶ 4.

On Tuesday, October 12, 2004, Williams, an X-ray technician, took an X-ray of the

Plaintiff's right foot without removing the splint.  Williams noted that the Plaintiff's foot

was "very swollen and blue" but did not see a fracture in his foot.  (*See* Complaint [1] at p.

7).  The Plaintiff told Williams he was in pain.  The splint remained on his right foot for

ten (10) days, during which time the X-ray was sent to Alabama to be read.  (*See*

Complaint [1] at p. 8).  The Plaintiff alleges that the results of the X-ray were known two

months later, sometime around the first week in December, 2004.  (*See* Complaint [1] at p.

8; 10).

Plaintiff claims that Guavara, as Assistant Heath Services Administrator, oversaw

FCI-Edgefield's medical services "on a daily basis" and was aware of the Plaintiff's injury.

The Plaintiff alleges that Guavara decided not to have the Plaintiff treated at a hospital in

order to save money.  Guavara also decided to have the Plaintiff's splint removed, and take

away his crutches, after ten days.  During the first week of December, the result of the

second X-ray was sent to FCI-Edgefield; this x-ray revealed a fracture.  Guavara allegedly

acknowledged to the Plaintiff that his foot was "a little deformed" but that it had healed up

well.  (*See* Complaint [1] at p. 10).

Plaintiff contends that his health is a priority to him, and that the negligent medical

care he received caused a deformity in his right foot, impairs his ability to walk , and has

damaged his tendons and ligaments.  (*See* Complaint [1] at p. 9).  He claims that the

Defendants violated his Eighth Amendment right to be free from cruel and unusual

punishment during confinement because they knew that the Plaintiff faced a substantial

risk of serious harm and disregarded that risk.  Plaintiff contends that the negligent failure

to provide him with adequate medical care has resulted in a substantial deformity in his foot, as well as tremendous pain.  Specifically, Faytong took the first X-ray, which he was not qualified to do.  Likewise, Faytong and Hamme were not qualified to read the X-rays, but did so and determined there was no fracture.  Williams was negligent because she should have removed the splint before taking the second x-ray, which the Plaintiff argues resulted in "missing the fracture in [his] foot."  Guavara was negligent when he ordered the splint to be removed ten days later, and took away the Plaintiff's crutches, leaving Plaintiff in pain to be treated only with aspirin.  Plaintiff further contends that the medical negligence caused him mental stress for which he has been seen by psychology services at FCI-Bennettsville.  (*See* Complaint [1] at p. 13).  He requests a jury trial, and seeks a total of $3.5 Million in compensatory and punitive damages from the Defendants.

        In support of summary judgment in this case, the Defendants have submitted a memorandum as well as the Plaintiff's medical records concerning the time frame at issue, and affidavits from the individual defendants.  These documents establish that Plaintiff reported to the FCI-Edgefield Health Services Department on October 9, 2004 and stated that while catching a football, his right foot twisted after landing on another player's foot. Plaintiff also stated he had severe pain, could not walk, and swelling.  Defendant Hamme, a Nurse Practitioner on duty at that time, examined the Plaintiff's foot; the examination revealed that the Plaintiff had pain in his right foot, no bruising, he was not able to bear weight on it, and it was swollen at the rear of the foot.  Defendant Faytong, a Certified Physicians Assistant also on duty at that time, took an x-ray of the foot.  According to Jose Serrano, M.D., the Clinical Director at FCI-Edgefield, Faytong is trained to perform and make cursory reviews of x-rays.  (Serrano Dec. At ¶¶ 1, 4)  Faytong then conducted a cursory review of the x-ray and did not see any broken, dislocated, or fractured bones. Faytong's reading of the x-ray was not a definitive diagnosis, and a further review of the x-

ray was deferred to the Clinical Director.  Defendant Faytong did not provide any treatment to the Plaintiff; but only performed the initial x-ray.  (Faytong Aff. At ¶¶ 3-4) By Declaration, Faytong states that at no time was he deliberately indifferent to Plaintiff's medical needs, and he was not negligent by taking the initial x-ray of Plaintiff's right foot. (Faytong Dec. At ¶ 5).

According to Serrano, fractures sometimes can be hard to detect in an x-ray, which is the reason the x-rays are sent to a contract radiologist for further review.  (Serrano Dec. At ¶ 5)  Defendant Hamme states by Declaration that while he did not see any broken, displaced, or fractured bones on the x-ray, he decided to err on the side of caution, and immobilized the Plaintiff's right foot with an open splint, and provided Plaintiff with the same treatment as Plaintiff would have had if he had had a fracture.  (*See* Hamme Dec. At ¶ 3; Serrano Dec. At ¶ 6).  Because there was no evidence of broken or displaced bones, immobilization of the foot was proper, and there was no need to send the Platiniff to the hospital.  (*See* Faytong Dec. at ¶ 3; Hamme Dec. At ¶ 3; Serrano Dec. At ¶ 5)  The Platniff was instructed not to bear weight on the foot, and provided a low bunk pass, instructed to return to the clinic on October 12, 2004, and was provided a prescription for Motrin for pain management.  *(See* Defendants' Exhibit #3, Plaintiff's Medical Records, Pages 000001 - 000003; Serrano Dec. At ¶¶ 3, 6).  Defendant Guevara, the Assistant Health Services Administrator at FCI-Edgefield, did not participate in providing medical care to Plaintiff on October 9, 2004.  (Guevara Dec. At ¶¶ 1-3).

On October 12, 2004, as instructed, Plaintiff returned to Health Services for follow-up on his right foot injury.  (Guevara Dec. At ¶ 4).  Examination revealed swelling, he was using crutches and was not bearing weight on the foot, bruising was present, he had good capillary refill, was able to move toes, and the open splint was in place.  It was indicated the initial x-ray taken appeared to be negative and Plaintiff was diagnosed with

right foot sprain.  However, another x-ray was ordered and performed by X-Ray technician

Amy Williams.  (Williams Dec. At ¶ 2)  Both the initial x-ray taken on October 9 and the

x-ray taken on October 12, 2004 were sent to and read by an outside radiology service.

(Guevara Dec. At ¶ 4)  As an x-ray technician, Williams does not provide personal medical

care to inmates, nor does she make treatment decisions.  Williams does not recall Plaintiff

making the statements he alleges he made during the time the x-ray was taken.  Williams

states she did not discuss his condition with him or make any recommendations to him.

(Williams Dec. At ¶ 4)

      A referral was made to the Clinical Director (Serrano) and Plaintiff was provided

with prescriptions for Tylenol and Ibuprofen.  Plaintiff was instructed to return for a

follow-up appointment on October 15, 2004.  Plaintiff was also provided with a pass for a

lower bunk, allowed to use crutches and splint, and provided with a 3 day convalescence.

(Defendants' Exhibit #3, Pages 000004 - 000006)

      On October 15, 2004, Plaintiff returned to the Health Services Department for

follow-up of his right foot injury.  Upon examination, he remained on crutches, had

substantial residual bruising present, swelling, and no signs of infection.  Plaintiff was

diagnosed with trauma of right foot with no apparent fracture.  He was instructed to

continue with Motrin as prescribed during the last visit, return to clinic for lay in as needed

and periodic examination, he was provided a medical slip permitting him to wear a soft

shoe and given a 4 day convalescence.  (Id. at Pages 000007 - 000009).

      On October 20, 2004, Plaintiff was provided with a medical authorization to wear a

soft shoe on his right foot for a period of 10 days.  (Id. at Page 000010).

      On November 9, 2004, the results of the x-rays performed on October 9, 2004, and

October 12, 2004, were received.  According to Hamme, on November 9, 2004, the x-ray

consultant service advised FCI-Edgefield that Plaintiff had sustained a fracture to the 2d

metatarsal in his right foot.  (Hamme Aff. At ¶4).   The October 9, 2004, x-ray report stated: "there appears to be a fracture involving the base of the 2nd metatarsal, no other bony abnormality is seen."  The October 12, 2004, x-ray report stated: "The foot is in a splint, the fracture previously identified involving the base of the 2nd metatarsal is not definitely seen through the splint."  (Id. at Pages 000011 - 000012).  According to Williams, she is not authorized to remove a cast or splint without a physician's order to do so.  Furthermore, "when a fracture is suspected, neither a cast nor split is removed to perform an x-ray."  Instead, the x-ray technique is adjusted.  (Williams Dec. At ¶ 2) Williams later learned that the radiologist who read this x-ray had indicated that the fracture previously identified involving the base of the 2d metatarsal was not definitely seen through the splint, but it does not mean the x-ray was faulty.  It simply means that no fracture was seen, an explanation which is supported by the third x-ray taken on October 30, 2004, where the radiologist did not see any evidence of a recent fracture.  (Williams Dec. At ¶¶ 2-3).  Williams states that she gave prompt and adequate medical care to Plaintiff, in accordance with proven standards of care, and was not deliberately indifferent to any of Plaintiff's medical needs.  (Williams Dec. At ¶ 5).

On November 16, 2004, Plaintiff returned to Health Services for follow-up of his right foot injury.  Platniff stated his right foot hurt and was swollen with medial arch pain only.  Examination revealed no bruising and scant swelling.  Medical staff recommended a repeat x-ray and provided Plaintiff with a prescription for Indocin and gave him a 3 day convalescence.  (Id. at Pages 000013 - 000015).

On November 26, 2004, Plaintiff was treated for a superficial abrasion to his right hand which he sustained while playing basketball.  Only minor first aid was required.  (Id. at Page 000016).   According to Hamme, Platiniff continued to participate in sports activities, although he had been told not to put any weight on his right foot.  Hamme

explained to Paltiniff on several occasions that he should not participate in sports activities while the injury to his right foot continued to heal.  (Hamme Aff. At ¶ 6.)

On December 2, 2004, the x-ray report for the x-ray taken on November 16, 2004, was received.  The report indicated the examination shows no evidence of recent fracture or other significant bony abnormality, negative study.  (Id. at Page 000017).

On December 7, 2004, Plaintiff reported to Health Services during routine sick call, complaining that his right foot was swollen and he was in pain.  Examination revealed Plaintiff had history of fractured right 2nd metatarsal, no bruising, no tenderness, and he wanted a soft shoe pass.  He was provided with a prescription for Indocin, instructed no sports for next four weeks and no soft shoe permit needed at this time.  (Id. at Pages 000018 - 000020).

On December 10, 2004, Plaintiff was provided with a medical authorization to wear athletic shoes until December 17, 2004.  (Id. at Page 000021).  On December 17, 2004, he was provided with a medical authorization to wear athletic shoes until January 20, 2005. (Id. at Page 000022).

On January 9, 2005, Plaintiff reported to Health Services and indicated he again had been injured while playing basketball.  Plaintiff was involved in a head-to-head collision and sustained a laceration over his right eyebrow and an abrasion to his left knee. The laceration over the right eye was cleansed and a steri-strip was applied.  Only minor first aid was required on the knee abrasion.  (Id. at Page 000023).

On January 11, 2005, Plaintiff reported to Health Services sick call for follow-up on the right eye laceration.  (Id. at Page 000024).

On January 12, 2005, medical staff indicated Plaintiff claimed his foot no longer bothered him, and asked to go back to work, stating he was able to wear his steel-toed work shoes without problems.  Medical staff noted the athletic shoes were intended to be

worn if foot pain persisted.  (Id. at Page 000025; Hamme Aff.  At ¶ 6; Guevara Dec. At ¶ 6).

On January 19, 2005, Plaintiff was examined by a contract Orthopedic Surgeon, who noted that Platniff had injured his right foot in October 2004 while playing basketball. He had a lot of pain, swelling, and bruising at the time.  X-rays that were taken showed a fracture of the base of the 2nd metatarsal and he was splinted for about 10 days.  Repeat x-rays showed because of the splint, he did not have any fractures and he came out of the splint.  He is still having pain, tenderness, and swelling in the foot and a repeat x-ray showed the fracture to be healed.  Examination revealed tenderness over the Lisfranc (second toe) joint with thickening in this region with mild tenderness over the base of the 2nd metatarsal.  The surgeon diagnosed Plaintiff with a strain of the second toe joint with prior fracture of the 2nd metatarsal and recommended Plaintiff be given a wider shoe to accommodate an arch support to off load the toe joint.  The Orthopedic Surgeon indicated it would take about 6 months for Paltiniff to reach maximum medical improvement.  The surgeon also noted Plaintiff was going to be sore for a while because the main injury was to the second toe joint.  (Id. at Page 000027; Hamme Aff. At ¶ 7; Guevara Dec. At ¶ 7).

On February 18, 2005, Plaintiff was treated for a left knee injury he claimed he sustained on February 14, 2005, while playing basketball.  He was diagnosed with a contusion and was instructed to rest one day and follow-up as needed.  (Id. at Page 000035-000036; Hamme Aff. At  ¶ 8; Guevara Dec. At ¶ 8)

On March 22, 2005, Plaintiff was seen during a sick call appointment for a complaint of chronic pain in the right foot.  Medical staff noted Plaintiff had a history of a fracture at the base of 2nd metatarsal.  Examination revealed the right foot had mild tenderness at the base of the 2nd metatarsal.  Plaintiff was provided with a prescription for Indocin, and was advised to avoid excessive strenuous recreation activities.  Palitniff

received appropriate medical care as evidenced by taking another x-ray of his foot; Plaintiff was instructed to return to the clinic as needed. (Id. at Pages 000038 - 000039; Hamme Dec. At ¶ 9; Guevara Dec. At ¶ 9).

On March 28, 2005, the x-ray report of an x-ray conducted on March 22, 2005, was received. The report stated: "There remains mild deformity involving the base of the 2nd metatarsal but the previous fracture appears to have healed satisfactorily. There is no evidence of recent fracture or dislocation." (Id. at Page 000040). On March 30, 2005, Plaintiff was provided with one pair of low-cut hard toed shoes. (Id. at Pages 000041 - 000042). Thus, Plaintiff continued to receive treatment for his right foot injury from February 18, 2005 through March 30, 2005. (Guevara Dec. At ¶ 9).

On April 7, 2005, Plaintiff was treated for a fractured right wrist he sustained on April 5, 2005, while playing basketball. A cast was applied, Ibuprofen was prescribed, 3 day idle approved, and he was instructed to perform light duty for 6 weeks. (Id. at Pages 000043 -000044; Hamme Aff. At ¶ 9; Guevara Dec. At ¶ 9).

After April 7, 2005, Plaintiff was seen by FCI-Edgefield medical staff on seven occasions for continued complaints of right foot pain. Plaintiff also was treated for injuries sustained while paying basketball during this period. (Guevara Dec. At ¶ 10). On April 27, 2005, Plaintiff was seen by the contract Orthopedic Surgeon for follow-up of his wrist fracture. During this examination the Orthopedic Surgeon noted that Plaintiff had been seen in the past for a Lisfranc fracture. At that time he recommended an extra depth shoe with an arch support. Dr. Holford noted Plaintiff received the extra depth shoe, but no orthotic to post his heel to neutral. An orthotic placed in the shoe to support the heel was recommended. (Id. at Page 000045). On May 18, 2005, Plaintiff was provided with the arch support recommended on January 19, 2005. (Id. at Page 000046).

On July 14, 2005, Plaintiff was seen during routine sick call for a complaint of chronic right foot pain. Examination revealed tenderness in the metatarsal area. Medical staff noted that x-rays on file indicate the 2nd metatarsal fracture was healed. The Plaintiff was diagnosed with post traumatic arthritis and provided with a prescription for Indocin. He was also instructed to do moderate exercise as tolerated and return to the clinic as needed. (Id. at Pages 000047 - 000048). According to Hamme, the Nurse Practitioner, Serrano, the Clinical Director, and Guevara, the Assistant Health Services Administrator, post-traumatic arthritis is a common side effect of metatarsal fractures, and Paltniff's continued participation is sports activities against medical advice has more than likely contributed to its cause. (Hamme Dec. At ¶ 11; Serrano Dec. ¶ 8; Guevara Dec. At ¶ 11).

On August 25, 2005, Plaintiff was transferred from FCI Edgefield to FCI Bennettsville. On August 29, 2005, Plaintiff was seen during routine sick call for complaint of past right foot injury. He stated he had suffered torn ligaments and tendons and wanted to be evaluated for a soft shoe pass. He was scheduled to be seen by a Mid-Level Practitioner. (Id. at Page 000052). On September 6, 2005, Plaintiff reported to sick call claiming his right foot still hurt. Examination revealed he had normal gait and no swelling. Plaintiff was diagnosed with alteration in comfort. (Id.)

On September 7, 2005, Plaintiff was seen during sick call for continued pain in the right foot. He was diagnosed with metatarsalgia (pain that emanates from the heads of the metatarsal bones and worsens with weight bearing or palpation) of the right foot. He was prescribed Ibuprofen, instructed to wrap foot up in elastic gauze, and an x-ray was ordered. (Id. at Page 000053).

On September 12, 2005, Plaintiff was seen during sick call and stated he still had pain in his right foot. Examination revealed tenderness and swelling down, range of motion ok, neurovascular intact. He was diagnosed with history of fracture at the base of

2nd metatarsal.  He was instructed to immobilize with ace wrap, educated on medication, and was provided with a permanent soft shoe permit.  (Id. at Pages 000054 - 000055).

On October 6, 2005, Plaintiff was seen during sick call for a complaint that his right foot hurt.  Medical staff noted there was no obvious injury and that the Plaintiff requested a soft shoe.  He was provided with a prescription for Motrin and referred to the Clinical Director for shoes.  (Id. at Page 000056).

On October 12, 2005, Plaintiff was treated for abrasions he sustained on his chest while playing basketball.  Only minor first aid was required.  (Id. at Page 000057).  On October 21, 2005, Plaintiff was seen during sick call for follow-up of right foot.  He stated he was doing ok but had off and on discomfort.  Examination revealed discomfort upon palpation of anterior aspect of metatarsal, normal toe movement, and full range of motion. He was provided with a prescription for Naprosyn, an Orthopedic consultation was initiated, he was educated about exercises and medication, and instructed to return to the clinic as needed.  (Id. at Page 000058).

On April 6, 2006, Plaintiff was seen by the Clinical Director regarding follow-up with a consultant Orthopedic Surgeon for his right foot.  He had no complaints at this time and stated the foot was doing "ok."  Examination revealed the right foot had normal range of motion, negative for swelling, and negative for tenderness when palpated.  The Clinical Director indicated the Orthopedic Surgeon follow-up was being put on hold, an x-ray was ordered, and Plaintiff was informed he would be provided with soft shoes.  Plaintiff indicated he understood and agreed.  (Id. at Page 000059 - 000060).  On April 27, 2006, Plaintiff was provided with a medical status pass indicating he was to be permitted to wear tennis shoes until May 27, 2006.  (Id. at Page 000060).  The Platiniff has continued to be seen by medical staff concerning his right foot through September 2006, and his

authorization to wear a soft shoe has been continuously extended. (Id. at Page 000061 - 000067).

## V. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the court must review all evidence "in the light most favorable to the nonmoving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In *Celotex*, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. *Celotex*, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. *Id*. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. *Anderson*, 477 U.S. at 248.

# VI.  ANALYSIS

## A.  Exhaustion

The Defendants state that the Plaintiff has exhuasted his administrative remeides, as required by 42 U.S.C. 1997e.  (*See* Attachments to Plaintiff's Complaint [1] *and* documents attached at Tab 2 to Defendants' Motion [22])

## B.  The Bivens Action

Since Plaintiff is a federal prisoner, his constitutional claims are evaluated under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which established a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights.  *Bivens*, 403 U.S. at 397.  A *Bivens* claim is analogous to a claim brought against state officials under 42 U.S.C. § 1983; therefore, caselaw involving § 1983 claims is applicable in *Bivens* actions, and vice versa.  *Ajaj v. United States*, — F.Supp. —, 2007 WL 840101 at *30 (D.S.C. March 19, 2007), *citing Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Bolin v. Story*, 225 F.3d 1234, 1241-1242 (11th Cir. 2000); *Campbell v. Civil Air Patrol*, 131 F.Supp.2d 1303, 1310, n. 8 (M.D.Ala. 2001).

In *Bivens,* the Supreme Court held that a violation of the Fourth Amendment by a federal agent acting under color of his authority gives rise to a cause of action for damages, despite the absence of any federal statute creating liability.  *Bivens*, 403 U.S. at 389.  The *Bivens* concept was extended in *Carlson v. Green*, 446 U.S. 14 (1980) to recognize an implied action for damages against federal prison officials for violations of the Eighth Amendment.  *Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006).  In order to state a claim for a *Bivens* action, a plaintiff must set forth facts detailing a deprivation of a federally protected right performed by "a federal agent acting under color of federal authority." *Bivens*, 403 U.S. at 389.  "Employees of the federal government are clearly proper *Bivens*

defendants, as they operate as federal agents and exert federal authority." *Lawson v. Liburdi*, 114 F.Supp.2d 31, 37 (D.R.I. 2000). At the time of events giving rise to allegations in the complaint, the Defendants were federal employees, and thus are amenable to suit under *Bivens*.[4]

Plaintiff sues the Defendants "for injury as to negligent acts by federal employee's [sic] under FTCA, as well as Constitutional violations brought forth in their individual capacity as federal employee's [sic] under *Biven's*[.]" (Complaint [1] at p. 1). Plaintiff further states that his action is brought against the Defendants "individually as well as employee's [sic] of the United States Government as Bureau of Prisons employee's [sic] for violations of the <u>Constitutional and Statutory</u> rights of the Plaintiff u[.]" (Complaint [1] at p. 2). Thus, the court understands Plaintiff's complaint to asserts causes of action agains the Defendants as individuals, as well as against the Defendants as federal employees.

It is well-settled that a *Bivens* action against federal agents in their <u>official</u> capacities for money damages based on allegations of constitutional violations is barred by the doctrine of sovereign immunity. *See Funches v. Wright*, 1986 WL 17980, at *1 (4th Cir. Nov. 6, 1986) (holding that in a *Bivens* action, plaintiffs must sue federal officials in their individual, and not official, capacities); *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir.1991) (same). And, just as there is no official capacity liability, the Fourth Circuit has made clear that in a *Bivens* suit, there is no respondeat superior liability. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001), *citing Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Thus, "liability is personal, based on each defendant's own constitutional violations." *Id.*

---

[4]     *See* Defendants' Motion to Dismiss [21-1] at p. 3.

*Bivens,* then, bars suit against the Defendants as federal agents in their official capacities.  With respect to whether the Defendants, sued as individuals, are amenable to suit by the Plaintiff, it appears that the Defendants are entitled to qualified immunity, as the record indicates that the Defendants' actions fall within the scope of their official duties.

### C.  Defendant Faytong Is Entitled To Absolute Immunity

It is undisputed that Defendant Faytong is a commissioned officer with the United States Public Health Service.  (*See* Faytong Dec. At ¶ 1).  By statute, he is absolutely immune from suit under the terms of the Public Health Service Act, 42 U.S.C. § 233(a)(1998).  Section 233(a) makes the Federal Tort Claims Act the exclusive remedy for legal actions against members of the Public Health Service "for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions ..., by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment."  *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000).  Section 233(a) protects commissioned officers or employees of the Public Health Service from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead.  The United States thus insures designated public health officials by standing in their place financially when they are sued  for the performance of their medical duties.  Where "Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective" the plaintiff is barred from bringing a *Bivens* action.  *Carlson v. Green*, 446 U.S. 14, 18-19.  Section 233(a) is just such an alternative remedy.  *Id*. at 20 (citing § 233(a), in the *Bivens* context, as an example of a statutory provision that explicitly designates an action under the FTCA as the exclusive remedy).  Therefore, all claims against Faytong should be dismissed.

### D.  Plaintiff's Claims Against Hamme, Williams, and Guevara

With respect to the Plaintiff's claim against the remaining Defendants, Hamme, Williams, and Guevara, regarding his medical care, in order to survive summary judgment and proceed with this constitutional claim in this Court, Plaintiff must present evidence sufficient to create a material issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Farmer*, 511 U.S. at 837; *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975); *Belcher v. Oliver*, 898 F.2d 32, 34 (1990).  After careful review of the affidavits and other exhibits presented to this Court, the undersigned finds and concludes that, whatever Plaintiff may think about the level of care he received, he has failed to submit evidence sufficient to create a genuine issue of material fact as to whether his constitutional rights were violated.

In order to establish a violation of the Eighth Amendment for inadequate medical care, a plaintiff must show that the defendants were deliberately indifferent to his serious medical needs.  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).  Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The Amendment also provides protection with respect to "the treatment a prisoner receives in prison and the conditions under which he is confined."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  Those conditions include the adequacy of the medical care that the prison provides.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

The showing necessary to demonstrate that particular conduct by prison officials is sufficiently serious to constitute cruel and unusual punishment "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In order to establish that he has been subjected to cruel and unusual punishment, Plaintiff must prove that the deprivation of a basic human need was, objectively, sufficiently serious, and that, subjectively, the officials acted with a sufficiently culpable state of mind. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)(*quoting Wilson,* 501 U.S. at 298). Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See Hudson*, 503 U.S. at 8-9. In order to demonstrate "an extreme deprivation," a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions. *Helling*, 509 U.S. at 33-35.

The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See Id*. at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). The accidental or inadvertent failure to provide adequate medical care to a prisoner does not violate the Eighth Amendment. *Estelle*, 429 U.S. at 104.

"[S]ociety does not expect that prisoners will have unqualified access to health care[.]" *Hudson*, 503 U.S. at 9. Therefore, to establish an Eighth Amendment violation, a

prisoner must show the medical need is serious. *Id*. at 9 (internal citations omitted).  What suffices as a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F. 3d 1364, 1373 (7th Cir. 1997).  A serious medical need has also been described as one that may be "life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once." *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

A prison official who actually knew of a risk to an inmate's health may be free from liability if the official responded reasonably to the risk, even if the ultimate harm was not averted.  *Farmer*, 511 U.S. at 842-44.  The reason for the intent requirement is based upon the Eighth Amendment, which bans only cruel and unusual punishment.  *Wilson*, 501 U.S. at 300.  Courts have traditionally attempted to avoid intervening and dictating the medical care of prisoners.  As noted by the Fourth Circuit, "[c]ourts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. . . .[which] remains a question of sound professional judgment." *Bowring v. Godwill*, 551 F.2d 44, 48 (4th Cir. 1977).

With respect to the subjective component of deliberate indifference, while an "express intent to inflict unnecessary pain is not required . . . [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishment clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104.  Deliberate indifference can be shown by the defendant's attitude and conduct in response to a prisoner's medical complaint. *Helling*, 509 U.S. at 36.  A

difference of opinion about the proper course of treatment, however, does not amount to deliberate indifference. *Estelle*, 429 U.S. at 107. Thus, it is clear that "[d]eliberate indifference entails something more than negligence[.]" *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Only deliberate indifference will be held to be a violation of the Cruel and Unusual Punishment Clause. *Farmer*, 511 U.S. at 835.

Significantly, mere negligence or malpractice in diagnosis or treatment is not sufficient to establish a constitutional violation. *Estelle*, 429 U.S. at 106; *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). Negligence does not give rise to a constitutional claim when the operative standard is "deliberate indifference." *Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001) (failing to take additional steps to care for suicidal inmate constitutes at most negligence, which is not actionable under 8th Amendment); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it."). The mere disagreement between an inmate and a physician over the appropriate form of treatment is not an actionable constitutional claim. *Wright v. Collins*, 766 F2d 841, 849 (4th Cir. 1975). Questions of medical judgment are not subject to judicial review. *Russell v. Scheffer*, 528 F.2d 318, 319 (4th Cir. 1975). Therefore, Courts should not "second-guess the propriety or adequacy of a particular course of treatment." *Bowring*, 551 F.2d at 48.

In this case, the court is of the opinion that there is more than sufficient evidence to prove the Defendants were not deliberately indifferent to Plaintiff's medical needs. In fact, the Plaintiff received the same care (immobilization of his foot with a splint) as he would have if he had been diagnosed with a fracture on October 9, 2004. (*See* Hamme Dec. At ¶ 3; Serrano Dec. At ¶ 6; Guevara Dec. At ¶ 3). Plaintiff also was told not to bear weight on his foot, and was given a low bunk pass, crutches, and pain medication (*See* Hamme Dec. At ¶ 4; Serrano Dec. At ¶ 3; Guevara Dec. At ¶ 4), all of which are consistent with the

treatment of a fracture as well as a sprain.  (*Id.*)  Plaintiff's allegation that the treatment he received was inferior is without basis.  Furthermore, Plaintiff's allegation that Defendants Hamme, Faytong, and Williams were not qualified to perform x-rays is baseless.  All of these Defendants are certified or licensed medical professionals, and are qualified to perform and make cursory reviews of rays.  Even though Defendants Faytong and Hamme initially diagnosed Plaintiff's injury as a sprain, he still received treatment commensurate with a fracture.  Plaintiff fails to provide any evidence, other than conclusory statements, that Guevara did anything that even remotely resembles deliberate indifference.  *(See* Guevara Dec.)  At most, Plaintiff's allegations are nothing more than mere disagreement over the prescribed treatment he received, which is not an actionable constitutional claim. Plaintiff has not provided a scintilla of proof the Defendants were deliberately indifferent to his medical needs.

According to the Nurse Practitioner, Hamme, even though Paltniff's fracture was not diagnosed until approximately one month after the injury, the treatment provided neverthess was within the standards of careprescribed for a fracutre of the 2d metatarsal. According to Hamme, "it is standard medical practice to treat metatarsal fractures in which the metatarsal is still well aligned with immobilitzation and non-weight brearing for 6-8 weeks.  Plaintiff was instructed several times to rest, convalese, and not bear weight on the right foot, but Platiniff failed to follow those instructions, as eviddenced by the sports injuries he received in the months after he injured his foot.  Indeed, Platniff's ocntinued participation in sports activities is evidence that the injury has not prevented him from functioning in a normal capacity.

Hamme states by affidavit that during the time Platniff was incarcerated at FCI-Edgefield, Paltniff recieved prompt and adequate medical care in accordance with proven

standards of care.  Hamme states thjat at no time was he deliberately indifferent to Plaintiff's medical needs.  (Hamme Aff. At 13-14).

In sum, the medical records and other evidence, including Plaintiff's own exhibits, provide no support for his medical claim. While Plaintiff was obviously dissatisfied with the medical care he was provided, for purposes of a constitutional claim, whether or not Plaintiff was provided with the care he desired or requested is immaterial.  *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir.1988) (the Constitution "does not guarantee to a prisoner the treatment of his choice."); *see also Brown v. Thompson*, 868 F.Supp. 326, 329-330, n. 2 (S.D.Ga. 1994); *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (A physician's actions only rise to the level of deliberate indifference when the treatment provided is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.").

To the extent that Plaintiff seeks monetary compensation for the mental or emotional distress allegedly experienced as a result of the medical treatment he received for his right foot, and not just for any alleged physical injuries, this claim is barred.  Under 28 U.S.C. § 1346(b)(2), Plaintiff cannot recover monetary damages for mental or emotional injury without a prior showing of physical injury:

> No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Therefore, to the extent Plaintiff is asserting a claim for mental or emotional injuries, it is without merit and should be dismissed.  *See Cassidy v. Indiana Dept. of Corrections*, 199 F.3d 374, 376 (7th Cir. 2000); *Taylor v. United States*, No. 06-00039, 2006 WL 2350165 at *3 (W.D.Va. Aug. 11, 2006) ("The plain language of the statute [§ 1997e(e) ] makes no distinction between different types of civil actions filed by inmates ... [t]he FTCA

specifically prohibits inmates from filing suit against the United States 'for mental or emotional injury suffered while in custody without a prior showing of physical injury.'" (quoting 28 U.S.C. § 1346(b)(2)).

### Qualified Immunity

Even if the Plaintiff were able to state a claim for medical malpractice, or medical negligence, the Defendants herein would be entitled to qualified immunity. Federal government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Wilson v. Layne*, 526 U.S. 603, 609 (1999) (internal quotations omitted). "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Harlow v. Fitzgerald*, 457 U.S. at 818.

In the context of a *Bivens* action, the qualified immunity defense is "an immunity from suit rather than a mere defense from liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In recognition of this, the Supreme Court has repeatedly stressed the desirability to resolve the qualified immunity issues at the earliest stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Once a defendant asserts the defense of qualified immunity, a plaintiff cannot maintain a *Bivens* action against a federal official in his individual capacity unless the plaintiff can prove that the defendant violated a clearly established constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 231-32 (1991).

In the present case, the Plaintiff cannot establish that the conduct of any defendant violated a constitutional right. He claims the Defendants acted negligently. Mere

negligence does not state a valid constitutional claim. *Daniels, supra*.  To the extent the claim is construed as alleging an Eighth Amendment violation, Plaintiff would have to prove that the Defendants were deliberately indifferent to a known serious medical need. At this juncture, he has, with respect to the allegation of failure to treat his condition, alleged nothing more than a disagreement with a medical decision.  As discussed, infra, that is insufficient to state a claim under the Eighth Amendment.  Therefore, the Defendants are entitled to qualified immunity and the case must be dismissed.

Furthermore, to the extent that Plaintiff is alleging that Defendants were negligent or their actions constituted medical malpractice, his claims must fail.  Negligence, in general, is not actionable under 42 U.S.C. § 1983 or under the *Bivens* doctrine.  *See Daniels v. Williams*, 474 U.S. 327, 328-336 & n. 3 (1986); *Davidson v. Cannon*, 474 U.S. 344, 345-348 (1986); *and Ruefly v. Landon*, 825 F.2d 792, 793-94 (4th Cir. 1987). Furthermore, neither Section 1983 nor the *Bivens* doctrine impose liability for violations of duties of care arising under state law.  *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200-203 (1989).  Additionally, medical malpractice is not actionable under Section 1983.  *Estelle v. Gamble*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  To the extent that Plaintiff's allegations concern his disagreement with the medical treatment he was provided, he fails to show a constitutional violation.  "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice."  *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988).  The provision of medical care by prison officials is not discretionary, but the type and amount of medical care is discretionary.  *See Brown v. Thompson*, 868 F.Supp. 326 (S.D.Ga. 1994).

### E.  Plaintiff's Claim under the FTCA

Plaintiff also alleges a claim pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et. seq.  Section 1346(b)(1) provides exclusive jurisdiction to hear actions against the United States for money damages for injury to or loss of property, or personal injury or death caused by a negligent wrongful act or omission of any federal employee while acting within the scope of his office or employment.  Plaintiff is alleging the negligence of government employees caused him to suffer a debilitating injury.  Accordingly, this Court is the proper jurisdiction for this action.

In a claim pursuant to 28 U.S.C. § 1346 (b)(1), the only proper party Defendant is the United States of America. Pursuant to 28 U.S.C. § 2679 suits against a federal agency on claims which are cognizable under 28 U.S.C. § 1346 (b) are not authorized.  By brief, the United States requests the individual Defendants be dismissed from this cause of action, and replaced with the United States of America as the Defendant.  (*See* Defendants' Brief [22] at pp. 20-21).

Next, the Defendant United States has by Brief also acknowledged that the Plaintiff has met the exhaustion requirement with respect to the FTCA claim.  (*See* Defendants' Brief [22] at p. 21).

With respect to damages, 28 U.S.C. § 2675(b) provides:

> An action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

Plaintiff claimed personal injury damages in the amount of One Million Dollars ($1,000,000) when he submitted his administrative tort claim to the Bureau of Prisons on February 1, 2006.  (*See* Exhibit 9 to Defendants' Brief [22]).  Therefore, Plaintiff's

recovery is limited to this amount.  Plaintiff has not made any showing to this court that he has some "newly discovered evidence" or intervening facts" that would justify an award in excess of that claimed in his February 1, 2006 tort claim.  Therefore, Plaintiff is not entitled to recover more than the amount presented to the federal agency, and Plaintiff's claim is limited to One Million Dollars.

The United States cannot be sued without a waiver of its sovereign immunity. United States v. Orleans, 425 U.S. 807, 814, (1976). The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by governmental employees acting within the scope of their employment.  *See* 28 U.S.C. 1346(b).  Under the FTCA, a plaintiff may recover monetary awards from the United States for injury, property loss, or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope . . . of employment."  28 U.S.C. § 1346(b).  The United States may be held liable only if the conduct complained of amounts to negligence "in accordance with the law of the place where the act or omission occurred."  *Id*.

Under the Federal Tort Claim Act, federal courts are directed to base the Government's liability determination based upon an analysis under state law. Accordingly, the claims relating to care provided by the Defendants at FCI Edgefield should be evaluated in accordance with South Carolina tort law.  In South Carolina, "[t]o establish a cause of action in negligence, a plaintiff must prove the following three elements: (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 339 S.C. 417, 422, 529 S.E.2d 710, 712 (2000).  "A determination of negligence, standing alone, is a far cry from a determination of liability.  Liability encompasses all elements of a negligence claim, including damages proximately caused by

the alleged negligence." *Hinds v. Elms,* 358 S.C. 581, 585, 595 S.E.2d 855, 857

(Ct.App.2004).

In South Carolina, the burden of proof in a medical malpractice case is entirely

upon the plaintiff. *Dumont v. United States*, 80 F.Supp.2d 576, 581 (D.S.C. 2000).  In

*Dumont*, the court held that in order to establish liability in such a case, the plaintiff must

prove the following by a preponderance of the evidence:

> (a) The recognized and generally accepted standards, practices, and procedures are in the community which would be exercised by competent physicians in the same speciality under similar circumstances;
>
> (b) that the physician or medical personnel negligently deviated from the generally accepted standards, practices, and procedures;
>
> (c) that such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury; and
>
> (d) that the plaintiff was injured.

The Plaintiff must establish the standard of care, and the defendant's failure to

conform to the required standard, by expert testimony, unless the subject matter is of

common knowledge or experience so that no special learning is needed to evaluate the

defendant's conduct. *Martasin v. Hilton Head Health System*, L.P., 613 S.E.2d 795, 364

S.C. 430 (S.C.App. 2005)(internal citation omitted).   "In addition to proving the defendant

negligent, the plaintiff must also prove that the defendant's negligence was a proximate

cause of the plaintiff's injury." *Carver v. Med. Soc'y of S.C.*, 286 S.C. 347, 350, 334

S.E.2d 125, 127 (Ct. App. 1985).

In the present case, the Plaintiff has not shown the manner (if any) in which the

Defendants deviated from the standard of care.  Furthermore, the Plaintiff has not set forth

any evidence, except for his own bald allegations, that the Defendants were negligent, and

the Plaintiff has failed to establish any causal link between the alleged negligence and the

Plaintiff's alleged injuries.  In short, the Plaintiff has utterly failed in his burden of proof. Therefore, it is recommended that the Defendants be granted summary judgment with respect to Plaintiff's claim for negligence.

## RECOMMENDATION

Based upon the foregoing, it is recommended that the **Defendants' Motion for Summary Judgment [22] should be granted**.


George C. Kosko
UNITED STATES MAGISTRATE JUDGE

April 23, 2007

Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).